**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

**Statesville Division**

**Case No.: 5:26-cv-267**

<table>
<tr><td>

**ADAM JOSEPH,**

Plaintiff,

v.

**WATAUGA COUNTY,**

**DANIEL DUCKWORTH** (Individually), and

**MEGAN JOSEPH TEETERS** (Individually),

Defendants.

</td><td>

**COMPLAINT**

**(Jury Trial Demanded)**

</td></tr>
</table>

**NOW COMES** Plaintiff Adam Joseph, through undersigned counsel, to complain of Defendants Watauga County, Daniel Duckworth (Individually), and Megan Joseph Teeters (Individually).

## I. PARTIES

1. Adam Joseph is an adult at least 18 years old and a resident of Catawba County, North Carolina. He is an adoptive parent of two minor daughters, C.J. and B.J. (the "Minor Children"), with his ex-wife, Defendant Megan Joseph Teeters.

2. Watauga County is a body politic and corporate, created by the General Assembly of North Carolina for public and political purposes, including protecting and promoting the general welfare and safety of children in its jurisdiction through its Department of Social Services ("DSS") and the DSS Child Protective Services ("CPS"). References to "CPS" identify the child protective services program of Watauga County, not a separately named defendant.

3. Daniel Duckworth is an adult at least 18 years old and a resident of Watauga County, North Carolina. He is Police Chief for the Town of Boone.

4. Megan Joseph Teeters is an adult at least 18 years old and a resident of Catawba County, North Carolina. She is Plaintiff Adam Joseph's ex-wife and an adoptive parent of the Minor Children.

## II. JURISDICTION AND VENUE

5. This Court has personal jurisdiction over Defendants under F.R.C.P. 4(k)(1)(A) because Defendants are subject to personal jurisdiction in the State of North Carolina under N.C. Gen. Stat. § 1-75.4.

6. This Court has original subject matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 42 U.S.C. § 1983.

7. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's state-law claims because they arise from the same alleged investigation, evidence manipulation, interference, and related conduct as the federal claim and form part of the same case or controversy.

8. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Watauga County, North Carolina, within this district.

---

## Nature and Scope of This Action

Plaintiff seeks relief for his own injuries caused by Defendants' alleged misconduct, including intentional evidence manipulation, interference with his exercise of parental rights and pursuit of legal remedies, and the alleged misuse of process. Plaintiff does not ask this Court to

modify, vacate, review, or declare invalid any child custody order; enjoin its enforcement; change the venue of the custody case; or direct criminal investigation or prosecution. Any challenge to a custody ruling will be pursued separately through the state court procedures applicable to that ruling.

The custody proceedings are described only to explain the context, alleged conduct, and claimed causation, not to request appellate review by this Court. Plaintiff does not currently seek recovery of damages belonging to the Minor Children, who are not plaintiffs in this action.

---

## III. FACTS

9. The above paragraphs are incorporated herein by reference.

10. Adam and Megan (and the Minor Children) currently reside in Catawba County, but almost all of the facts giving rise to this Complaint occurred in Watauga County.

11. Watauga County has liability insurance or risk-pool coverage that applies to claims in this Complaint. Pursuant to N.C. Gen. Stat. § 153A-435, Plaintiff alleges waiver of governmental immunity to the extent of applicable coverage for those claims. The limited waiver of jury determination of insurance-related issues appears in the jury demand below.

### Background

12. Adam and Megan married in 2015 and divorced in 2021.

13. During the marriage, Adam and Megan adopted the Minor Children.

14. The Minor Children are twin girls and were young minors throughout the events alleged in this Complaint.

15. During the marriage, Megan subjected Adam to continuous physical, mental, and emotional abuse.

16. In addition to mental and emotional abuse, Megan often violently and unexpectedly hit Adam and threw hard objects that inflicted physical injury on Adam for no legitimate reason.

17. Megan's marital behavior resulted in Adam developing and being diagnosed with Complex Post-Traumatic Stress Disorder ("CPTSD").

18. CPTSD is generally described as a mental health condition caused by long-term, repeated trauma where the victim feels trapped.

19. After the divorce, Adam and Megan shared 50/50 joint custody of the Minor Children until March 2025 (which arrangement they agreed on outside of court).

20. After the divorce, Adam resided in Avery County, North Carolina.

21. After the divorce, Megan resided in Watauga County, North Carolina.

22. Around mid-2023, Megan told Adam for the first time that she had had an extra-marital sexual relationship with Daniel Duckworth while she was married to Adam.

23. Upon information and belief, Megan and Duckworth had an extra-marital sexual relationship while she was married to Adam (including before they separated).

24. Adam did not know about the affair until Megan told him.

25. Megan knew Duckworth because Adam and Duckworth had worked together on a joint narcotics task force for the U.S. Department of Homeland Security ("DHS") in western North Carolina in the 2010s.

26. Duckworth and Megan had a dating and/or sexual relationship.

27. The Minor Children stated that Megan introduced them to Duckworth as her "special friend."

28. Adam's employer while on the DHS task force was Caldwell County Sheriff's Office.

29. Duckworth's employer was Boone Police (though he was an officer then, not Chief).

## **Allegations of Child Abuse Against Megan**

30. In or around early March 2025, Adam received a phone call from Megan.

31. Megan told Adam that she had been contacted by Watauga County CPS.

32. Megan told Adam that CPS was investigating allegations of child abuse that had been made against Megan.

33. Megan told Adam that the investigation was based on the Minor Children reporting that Megan had slapped C.J. and called B.J. "fat."

34. Megan told Adam that CPS wanted to interview the Minor Children.

35. Megan told Adam that she would not give CPS access to her home.

36. Megan told Adam that she would not allow CPS to interview the Minor Children.

37. Megan instructed Adam to not allow CPS to interview the Minor Children.

38. Megan told Adam that, if he cooperated with CPS, it would "ruin everything" and result in both of them losing custody of the Minor Children.

39. Adam was confused because he had not done anything wrong that would affect his custody or relationship with the Minor Children.

40. Adam has, at all times relevant, been a fit and loving parent to the Minor Children.

41. Adam stated to Megan that the only thing he knew was that Megan had beaten him for five years while they were married.

42. Megan responded, "Shut the fuck up. I'm trying to tell you what to do."

43. Adam formed the impression that Megan was recording the phone call because she made certain statements that sounded unnatural to her and tried to elicit certain responses from Adam that seemed calculated to defend herself.

44. For instance, Megan stated, "You know I'm not abusing the girls, right?"

45. Before the phone call from Megan, Adam was unaware that Megan might be abusing their Minor Children (the Minor Children kept any such information private with their therapist).

46. Adam did not make the report against Megan.

47. After the call from Megan, Adam promptly called his children's school principal to inform her about his call with Megan.

48. Adam told the school principal that, if CPS came to interview the Minor Children, they had his permission to do so.

**The CPS Investigation Before Chief Duckworth's Involvement**

49. In March 2025, Watauga CPS went to the school and interviewed the Minor Children.

50. Mandy Davis, the CPS investigator, requested for Adam to be present at the school for the interviews in the event Megan showed up to try to stop them.

51. After the interviews, Investigator Davis told Adam that Megan was "unsafe" for the Minor Children and instructed Adam to immediately seek emergency custody.

52. Investigator Davis told Adam that, if Adam did not have emergency custody by next Monday, CPS would place the Minor Children in foster care because Megan was unsafe and not cooperating with the CPS investigation. This confused Adam, who was a safe and fit parent.

53. The school's first therapist to counsel the Minor Children, Margaret Kirk, left the school for another job. Before leaving, Kirk called Adam and told him that, if he sought full custody, he needed to subpoena her notes. Adam did not then know the contents of her notes.

54. On March 18, 2025, Adam (through his attorney) filed for temporary emergency custody of the Minor Children based on Investigator Davis's instruction to do so.

55. Adam's attorney requested facts that would support an emergency custody order.

56. Because the information was confidential, Adam (through another attorney who had

offered her assistance) contacted DSS to request the facts that his attorney needed to file.

57. Investigator Davis told Adam that the Minor Children had reported physical abuse by Megan, including hitting, choking, and slapping; inadequate or unsafe food; unsafe or unclean conditions in the home; intentional exposure to sexually explicit material and conduct; and examinations of their private parts purportedly to assess their development; amongst other facts.

58. Megan produced and posted sexually explicit content online.

59. Upon information and belief, Megan produced that content at home while the Minor Children were present. The reported exposure of the Minor Children to sexual material is described separately above and below.

60. Adam shared the above facts from Investigator Davis with his attorney.

61. Based on those facts, the court awarded Adam with temporary emergency custody of the Minor Children.

62. Megan was not permitted to see the Minor Children at all, pending a hearing on the temporary emergency custody order.

63. There were other confidential allegations of abuse by Megan about which Adam was unaware at that time.

64. Investigator Davis told Adam that there was very strong evidence that Megan had "abused" the Minor Children and was "unsafe," and CPS would take legal action against Megan.

65. A law enforcement contact informed Adam that the Watauga County Sheriff's Office also had an active investigation into Megan.

**Chief Duckworth Gets Involved**

66. By this time, Duckworth had been promoted to Chief of Boone Police Department.

67. Upon information and belief, Duckworth and Megan continued a romantic or sexual

relationship during the period relevant to the investigation.

68. After the Minor Children returned from visitation with Megan, they stated to Adam that Megan had tried to reassure them that they did not need to be worried because “Duck” (referring to Chief Daniel Duckworth) was involved and everything would be “OK.”

69. Upon information and belief, Megan asked Chief Duckworth to help protect her and keep her from losing custody of the Minor Children.

70. Upon information and belief, Duckworth used his position as Police Chief and his relationship with DSS Director Tom Hughes to influence the handling of the investigation in Megan’s favor, including the alleged interference with interviews and manipulation of evidence described below.

71. Upon information and belief, Duckworth acted in part to protect his career and reputation from disclosure of his relationship with Megan during the alleged child abuse.

---

72. While in Adam’s custody and care, CPS referred the Minor Children to the Children’s Advocacy Center (“CAC”) in Ashe County for a forensic interview.

73. Adam consented to the CAC interview.

74. A Boone police officer (whose name is not disclosed to help prevent retaliation) told James Lyall, a former Boone Police officer, that the officer had overheard Chief Duckworth on his phone in his office at Boone Police Department attempting to stop the CAC interview.

75. Lyall then called Adam to share what he was told.

76. Upon information and belief, Chief Duckworth tried to prevent the CAC interviews of the Minor Children from being conducted.

77. Upon information and belief, Megan directed or asked Chief Duckworth to do so.

78. Upon information and belief, Chief Duckworth spoke with DSS Director Tom Hughes or another person at DSS.

79. That same Boone Police officer mentioned in paragraph 74 also overheard Chief Duckworth state on the phone that Megan undresses and gets fully nude in front of the Minor Children when she gets home from work, and that Megan instructed the Minor Children to retrieve her cell phone knowing that sexual content is displayed and the Minor Children see it.

80. Adam learned about the facts in paragraph 79 from Lyall. Neither CPS nor anyone else had disclosed those facts to Adam.

81. After the CAC interviews concluded, a CAC employee walked out of the room and, appearing sullen, stated to Adam, "Your children are so brave."

82. When Adam later learned what the Minor Children had reported to CAC, he cried because of the specific nature and details of the reported abuse.

**After Chief Duckworth's Involvement**

83. About a week after the Minor Children informed Adam that they heard "Duck" was getting involved and the Boone Police officer heard Chief Duckworth attempting to shut down the CAC interview, the entire tone of the CPS investigation and investigators' opinions of Megan as "unsafe" suddenly changed for no known reason.

84. At the emergency custody hearing, the judge restored limited visitation to Megan.

85. Upon information and belief, the Minor Children's testimony from the CAC interview was not considered at that hearing.

86. Despite initial urgency by CPS to protect the Minor Children and investigators telling Adam that legal action against Megan was imminent, the CPS investigation stalled.

87. CPS investigators suddenly stopped giving Adam regular updates.

88. Investigator Davis, who had previously been helpful and supportive, suddenly turned rude and combative toward Adam.

89. Adam was not aware of any legitimate reason for these sudden changes from CPS.

90. The Minor Children told Adam that CPS (specifically, Investigator Davis and Anna Lunsford) had begun heavily coaching them and trying to change their answers from the CAC interviews and previous CPS interviews.

91. The Minor Children stated that CPS was trying to make Megan appear "safe" and discredit their testimonies.

92. The Minor Children described repeated questioning by Davis and Lunsford that substituted different meanings for their earlier accounts. They reported questions to the effect that an event had not happened as previously described, and that being scared of their mother meant only that they felt safer with their father.

93. The Minor Children told Adam that CPS investigators documented Megan's displays of affection despite the Minor Children telling the investigators that those displays were not typical of Megan's conduct toward them.

94. Investigator Davis also began conducting pre-scheduled interviews at Megan's home (where the Minor Children had reported being abused and feeling uncomfortable).

95. The Minor Children told Adam that the interviews at Megan's home made them feel very uncomfortable. They stated they did not want to be there.

96. Moreover, the Minor Children stated that the CPS interviews were being conducted in Megan's basement where Megan had placed a camera that allowed her to hear what the Minor Children were telling CPS.

97. The Minor Children told Adam that Megan yelled at them for what they told CPS.

98. Upon information and belief, Megan also used this "private" information to her advantage in the investigations. She knew exactly what allegations she needed to address.

99. When Adam told Investigator Davis about the camera, Investigator Davis continued to interview the Minor Children on camera where Megan could listen.

100. Megan had time to consider her response to what the Minor Children told Investigator Davis and then offer planned, untruthful rebuttal.

101. On one occasion, B.J. heard Investigator Davis call B.J. insane or mentally ill.

102. When Adam questioned Investigator Davis about what she called B.J., Davis laughed and stated that she did recall something like that, but that it was Megan who said it.

103. Investigator Davis's explanation was inconsistent with what B.J. told Adam and, upon information and belief, false.

104. The Minor Children stated that, during one CPS visit, a male CPS employee who the Minor Children had never met tried to interview them, which made the Minor Children feel even more uncomfortable.

105. CPS brought in the man after Adam had informed them that unknown men make the Minor Children uncomfortable.

106. The Minor Children stated that, during another CPS visit, Lunsford hugged and consoled Megan in their presence.

107. The Minor Children stated that, during the hug, Lunsford told Megan something to the effect of, "I'm so sorry this is happening to you. If I was going through what you are, I would not be handling it as well."

108. After that hug and comment, the Minor Children told Adam that they were scared of, and did not trust, Investigator Davis and Lunsford.

109. When Adam questioned Lunsford about the hug, Lunsford stated in a condescending tone that it was called "empathy."

110. Lunsford did not show Adam (or the Minor Children) any similar form of supposed empathy.

111. The Minor Children told Adam that it felt like CPS did not believe them, and that CPS was believing Megan over them.

112. Avery County CPS had initially been assisting Watauga County CPS.

113. Consistent with initial statements from Watauga County CPS, Avery County CPS investigators told Adam that they had serious concerns that Megan was unsafe and should not be alone with the Minor Children.

114. One Avery County CPS investigator stated that she was afraid Megan might be "grooming" C.J. for an illicit purpose, such as sex trafficking or pornography, but Watauga County CPS appeared to ignore those concerns.

115. For an unknown reason, Avery County CPS suddenly dropped out and Watauga County CPS took full control over the investigation.

116. Avery County CPS told Adam that Watauga County CPS investigators refused to accept or include Avery County CPS's evidence, opinions, or recommendations.

117. Watauga County CPS did not include evidence from Avery County CPS because that evidence depicted Megan as unsafe, which was not Watauga County CPS's desired outcome.

118. When Lunsford came to visit Adam in Avery County, B.J. was scared and hid in Adam's car.

119. Adam informed Lunsford of his serious concerns about what the Minor Children were saying and the investigation being biased and incomplete.

120. Lunsford became very defensive and combative toward Adam.

121. Adam informed Lunsford that he was audio-recording the conversation (because Adam no longer trusted Investigator Davis and Lunsford, who had lied to him, and Adam wanted objective evidence of their responses to what he was hearing from the Minor Children).

122. Lunsford was further agitated to learn she was being recorded.

123. Lunsford then started trying to speak past Adam to B.J., who was located in the car behind Adam.

124. Lunsford stated that she was trying to make sure B.J. was safe because it was hot outside and B.J. was in the car without air conditioning.

125. Adam disputes Lunsford's characterization that B.J. was unsafe in the car and alleges her characterization was false to create a self-protecting narrative on Adam's recording.

126. Adam was only trying to protect B.J. from Lunsford, who made B.J. feel afraid.

127. After that, CPS's communication with Adam almost ceased entirely.

128. Adam's parents had to email CPS on Adam's behalf to communicate important information about the Minor Children and receive status updates.

129. Adam repeatedly asked Investigator Davis for appointment of an independent Guardian ad Litem ("GAL") to represent the Minor Children's interests.

130. Investigator Davis refused Adam's requests for a GAL every time.

131. Adam also requested at least five times for Investigator Davis to recuse herself as the investigator because he believed she was being unduly influenced by Chief Duckworth or someone at his direction.

132. Adam's concern about outside influence arose from Megan's relationship with Duckworth, Duckworth's position as Police Chief, and the working relationship between CPS

and Boone Police.

133. Chief Duckworth and DSS Director Tom Hughes were also friends.

134. Moreover, the Minor Children reported to Adam that they had seen nude pictures of Chief Duckworth on Megan's phone.

135. Investigator Davis did not recuse herself.

136. Lunsford admitted some of the above-described behaviors to Adam, like hugging and consoling Megan, and her statements are documented on an audio recording.

137. At some point, Investigator Davis falsely denied stating that Megan was unsafe or instructing Adam to file for emergency custody after CPS first interviewed the children.

138. Despite there being no concerns about Adam and Adam trying to protect the Minor Children, CPS seemed to then shift its investigation from Megan to both parents.

139. CPS served a Safety Plan on Adam.

140. When Adam asked the reason he received a Safety Plan, Investigator Davis stated that the Safety Plan was intended only for Megan and that it had been served on Adam "by accident."

141. Adam asked Investigator Davis to correct the record and retract the Safety Plan for him.

142. Investigator Davis stated that she would.

143. Upon information and belief, Investigator Davis did not correct the record.

144. Investigator Davis later claimed, falsely, that Adam had violated the same Safety Plan that she told Adam did not apply to him.

145. Upon information and belief, Investigator Davis and Lunsford intentionally manipulated CPS records (which included falsifying, omitting, manufacturing, and

misrepresenting evidence) to make Megan look safe for the Minor Children, despite direct and objective evidence existing that showed otherwise (e.g., the CAC forensic interviews, the Minor Children's testimonies, Avery County CPS records, Dr. Kirk's notes, etc.).

146. Upon information and belief, CPS also manipulated records to prejudice Adam by stating – falsely – that he violated the Safety Plan and was not cooperative.

147. If Adam appeared non-cooperative, it was because he was questioning the integrity of the CPS investigators and their investigation.

148. Every action that Adam took was to protect the Minor Children from harm.

---

149. Adam emailed Tom Hughes, Director of DSS, to report Adam's serious concerns with Investigator Davis, Lunsford, and what he had observed with the investigation.

150. Adam told Director Hughes that Adam had an audio recording of Investigator Davis and Lunsford to show that Adam's concerns were legitimate and should be reviewed.

151. Director Hughes replied that CPS had employees committed to protecting children, conducting prompt and fair investigations, and other template-sounding language.

152. Director Hughes offered to meet with Adam, but only if Investigator Davis and Lunsford were present.

153. Director Hughes refused to listen to Adam's audio recording, stating that people who make recordings are a "yellow flag" to Hughes and that it wouldn't change anything.

154. Director Hughes then instructed Adam to cooperate with the CPS investigation.

155. Adam formed the impression that meeting with Director Hughes would be futile.

156. Adam and Director Hughes never met.

157. Upon information and belief, Director Hughes did not review Adam's concerns

or address the bias or evidence manipulation by the investigators.

158. Director Hughes did not assign a new investigator.

159. The investigation continued without review or correction of the evidence-handling or bias concerns that Adam had reported to Hughes.

160. Upon information and belief, Director Hughes was acting under the influence, or at the direction of, Chief Duckworth to ensure the CPS investigation would be closed without further action against Megan to protect the Minor Children.

---

161. CPS then ordered psychological evaluations on both Adam and Megan.

162. Those evaluations were performed by Dr. Gordon Cappelletty, a psychologist at Crossroads Counseling Center, Inc. in Hickory, North Carolina.

163. Watauga County CPS has had a long-standing relationship with Dr. Cappelletty.

164. After Megan's evaluation, at a custody exchange, Megan stated to Adam in a bragging manner that she had passed all four evaluation parts "with flying colors."

165. Despite Adam being diagnosed by multiple licensed and qualified mental health professionals with CPTSD, Dr. Cappelletty denied seeing any evidence of CPTSD in Adam.

166. Dr. Cappelletty's initial assessment differed from the CPTSD diagnoses Adam had received from multiple other mental health professionals and from the history of abuse Adam had reported.

167. Upon information and belief, Dr. Cappelletty received information from CPS and/or Chief Duckworth to which Adam was not privy, which information unduly influenced the psychological evaluations.

168. For example, Dr. Cappelletty repeatedly questioned whether Adam's mental

health had resulted in Adam being forced to surrender his law enforcement badge. Each time, Adam stated honestly that it did not, but Dr. Cappelletty seemed to be informed otherwise.

169. Sensing bias in Dr. Cappelletty's evaluations, Adam informed Dr. Cappelletty during his last visit that Adam's parents were members of the board of directors for Cornerstone Counseling (a large and prominent Christian counseling center) and stated that his parents and others at Cornerstone were very interested to see Dr. Cappelletty's findings.

170. Dr. Cappelletty asked Adam for the names of his parents, which Adam provided.

171. Dr. Cappelletty then paused and stated, "I just saw something in my notes" and stated that he needed to call Megan back in to follow up.

172. Dr. Cappelletty then changed his evaluation to describe Megan as having "narcissistic tendencies."

173. Dr. Cappelletty also changed his evaluation to state that Adam had PTSD (which is different than his diagnosis of CPTSD, which was caused by Megan).

174. At the final evaluation session, Dr. Cappelletty told Adam that Investigator Davis had repeatedly insisted that he ask whether Adam had opposed Megan becoming pregnant because of its effect on her body and whether Adam had opposed adopting the Minor Children.

175. Dr. Cappelletty stated that he did not want to ask the above questions, which did not seem relevant, and he only did so because of Investigator Davis's continued insistence.

176. Based on the evaluation, Dr. Cappelletty and Investigator Davis did not appear to similarly press Megan on the myriad of concerns related to Megan's mental health, parenting ability, and whether she was safe to be around the Minor Children.

---

177. Adam was later informed that C.J. recanted her multiple consistent accounts of

abuse by Megan.

178. C.J. recanted only after significant pressure from Megan and CPS.

179. B.J. never recanted and stood by her statements, which were also consistent.

180. C.J. recanting, however, was enough for CPS to justify closing the investigation.

181. Watauga County CPS closed its investigation without filing legal action against Megan or taking any effective action to protect the Minor Children from Megan.

182. Adam alleges that Duckworth's interference contributed to the manipulation and suppression of evidence described in this Complaint.

183. Chief Duckworth then blocked Adam on Facebook and Instagram.

184. The Minor Children showed Adam a picture of a cut on C.J.'s head that they stated was caused by Megan repeatedly bashing C.J.'s head against the wall of Megan's home after the CPS investigation was closed. That picture is documented.

185. Megan pulled the Minor Children from counseling (which they desperately need) and told them to not speak with anyone about what she considers "private family matters."

186. The severely flawed and biased CPS investigation prevented a fair review of the evidence by the Sheriff's Office, the District Attorney's Office, and the court.

187. For instance, the Minor Children told Adam that they had repeatedly requested examination of Megan's cell phone to obtain evidence that would substantiate their allegations.

188. The Minor Children stated that CPS did not ask Megan to look at her phone.

189. The Minor Children told Adam that, while riding in the car with Megan driving, Megan was receiving nude pictures of people (including Megan and her now-husband) in a group chat on her phone that the Minor Children viewed.

190. Investigator Davis was informed by email about the Minor Children being

exposed to those nude pictures and that the Minor Children were incredibly scared to meet Megan's now-husband for the first time because of seeing him naked.

191. Investigator Davis did not respond to the email about the Minor Children viewing nude pictures of Megan's now-husband.

192. Investigator Davis did not include that information in the investigation or take effective action to protect the Minor Children from being exposed to such inappropriate sexual content.

193. A credible law enforcement contact told Adam that the State Bureau of Investigation ("SBI") had offered to perform a Cellebrite forensic analysis of Megan's phone for the Sheriff's Office's investigation.

194. The law enforcement contact told Adam that the Sheriff's Office had refused the SBI's offer, stating that it was a "he said, she said" case so forensic analysis was unnecessary.

195. After not seeing any movement on the case by any Watauga County agency or getting any update for weeks, which was contrary to what CPS had told Adam to expect before Duckworth's involvement, Adam reached out to a credible law enforcement contact to try to find out what was happening. (All anonymous law enforcement contact names are known and will be revealed outside of this Complaint.)

196. Adam's law enforcement contact stated that, after speaking with his contact at the SBI, it appeared that Boone Police had shut down the case by making the Minor Children's allegations appear an unreliable case of "he said, she said."

197. Boone Police did not have jurisdiction over the CPS case.

198. Upon information and belief, "Boone Police" referred to Chief Duckworth.

199. During their work together on the narcotics task force, Duckworth told Adam

that he had a close personal and sexual relationship with the female criminal investigator at the Watauga County Sheriff's Office.

200. Upon information and belief, Duckworth used that relationship to influence the handling of the Sheriff's Office investigation involving Megan.

201. The Minor Children repeatedly reported to Adam that Megan had harmed them. As described above, CPS investigators initially told Adam that Megan was "unsafe."

202. If the Minor Children's testimonies appeared "he said, she said" or inconsistent, it was because of intentional manipulation by Chief Duckworth and Watauga County employees.

203. The Minor Children stated to Adam that they did not understand why nobody seemed to believe them and why nothing was being done to protect them.

---

204. Adam's first attorney for the child custody case suddenly, without notice, filed a motion to withdraw in or around April 2025.

205. The first attorney told Adam that Megan's attorney, Andy Brooks, had stated that there was a rumor that the first attorney had had sex with Megan and the first attorney would be questioned about it if he continued to represent Adam.

206. Brooks and his wife are close friends with Chief Duckworth.

207. Brooks, Brooks' wife, and Chief Duckworth are also members of the Boone Area Cyclists (BAC) and regularly road-cycle together.

208. Upon information and belief, Chief Duckworth referred Megan to Brooks.

209. Upon information and belief, the "rumor" in paragraph 205 was false.

210. Upon information and belief, Chief Duckworth or someone at his direction started the rumor in paragraph 205 to intimidate Adam's attorney and/or disrupt Adam's case.

211. Adam's second attorney also withdrew for no known reason in or about September 2025.

212. As soon as Adam hired his second attorney, the attorney instructed him to call Investigator Davis to state that this whole matter was a "misunderstanding" and that Davis had never stated that Megan was "unsafe" or instructed Adam to get emergency custody.

213. The second attorney insisted that, somehow, doing so was necessary to keep custody of his children.

214. The second attorney's advice did not make any sense to Adam.

215. The statement the second attorney asked Adam to make contradicted Davis's earlier statements to Adam that Megan was unsafe and that he should seek emergency custody.

216. There was a child custody hearing scheduled for November 3, 2025 – less than two months after the second attorney withdrew from the case.

217. Following November 3, 2025, Megan had full legal and physical custody of the Minor Children. Adam only had supervised visitation every other weekend.

218. Despite the court order, Megan refused to let Adam see the Minor Children for more than four months.

219. Adam finally found a third attorney to file a motion to enforce the court order so he could see the Minor Children.

220. The third attorney told Adam that he filed the motion but the court did not do anything.

221. After reviewing the court's Odyssey portal, Adam learned that the third attorney had filed the motion but never noticed it for hearing.

222. Megan then filed a motion to modify custody again on July 10, 2026, this time

seeking sole legal and physical custody of the Minor Children.

223. The third attorney sent notice of Megan's motion to Adam's house in Avery County, where the attorney knew Adam was no longer residing. No notice was sent to Adam's current home address or his email address, which addresses were the ones given to the attorney.

224. In addition to Adam not knowing about the upcoming hearing until shortly before the hearing date, his third attorney did almost nothing to prepare (or discuss with Adam).

225. The third attorney's actions significantly impeded Adam's ability to prepare for the hearing and necessitated hiring a fourth attorney just a week before the hearing to avoid losing the right to see his children. Adam (and, somehow, Adam's parents) nevertheless lost that right, and the reasons for that ruling are being challenged by separate appeal.

226. Upon information and belief, Chief Duckworth or someone at his direction was pressuring Adam's attorneys to withdraw from, or to otherwise adversely affect, his case.

227. Adam wrote a letter to the Boone Town Council (Chief Duckworth's employer) to inform them what Adam believed had happened and to request an investigation.

228. The Town Council did not acknowledge Adam's letter.

229. The alleged manipulation of evidence and interference with Adam's exercise of parental rights exacerbated his CPTSD and caused severe stress, anxiety, and depression requiring regular counseling and medication. Adam seeks damages for his own resulting injuries.

230. Plaintiff seeks recovery for the injuries and inherent harm caused by Defendants' alleged intentional manipulation of evidence, as described herein.

---

231. As stated above, on July 10, 2026, Megan filed a motion to modify custody in Watauga County district court to be awarded sole legal and physical custody of the children.

232. On September 1, 2026, Adam's attorney sent a notice of intent to sue and a document preservation notice to Megan's attorney, Mr. Brooks.

233. The hearing on Megan's motion to modify custody was held October 21, 2026.

234. Modification of custody under N.C. Gen. Stat. § 50-13.7 requires a substantial change in circumstances affecting the child's welfare and a determination that modification serves the child's best interests.

235. Megan (through her attorney) used nearly the entire October 21 hearing to (1) question Adam extensively about the facts and allegations related to this Complaint without prior notice or the presence of his appropriate attorney; (2) attempt to discredit Adam by repeatedly calling him and his elderly parents "conspiracy theorists" who should not have contact with the Minor Children, among other things; (3) obtain information concerning this proposed action before filing, most notably by repeatedly trying to compel Adam to disclose the identities of the credible law enforcement contacts referenced in the draft complaint and this Complaint; (4) force Adam to make statements on the record that could be harmful to this matter; (5) retaliate against Adam for suggesting an intent to sue the Defendants; and (6) obtain Adam's abandonment of the claims asserted in this Complaint against Megan and Chief Duckworth in exchange for very limited, supervised visitation with the Minor Children.

236. Adam repeatedly objected to many of Mr. Brooks's questions throughout the hearing based on irrelevance, as they were almost solely focused on the allegations in this Complaint.

237. The hearing was only minimally tied to the legal standards in N.C. Gen. Stat. § 50-13.7. Plaintiff challenges Megan's alleged misuse of the proceeding for the collateral purposes stated above, not the validity of the custody ruling in that action.

# IV. LEGAL CLAIMS

## Claim # 1: Violation of 42 U.S.C. § 1983: Fourteenth Amendment Due Process, County Liability, and Joint Action

**(Against All Defendants)**

238. Plaintiff incorporates the above paragraphs as if fully set forth herein.

239. The 14th Amendment of the U.S. Constitution prohibits State governments, including Watauga County, from depriving a person of life, liberty, or property without due process of law.

240. Adam had a fundamental liberty interest in the care, custody, and control of his children. See Troxel v. Granville, 530 U.S. 57, 65 (2000).

241. Procedural Due Process: Adam alleges that Defendants deprived him of his parental liberty through intentional evidence manipulation and dissemination that denied him a meaningful opportunity to present, review, and respond to the evidence affecting that liberty. The challenged conduct includes the manipulation of the Minor Children's accounts; the exclusion and manipulation of records; the Safety Plan served on Adam, the representation that it did not apply to him, the promise to correct the record, and the later false accusation of a violation; and the dissemination of manipulated evidence described herein. Adam alleges that this conduct, together with the alleged interference with misrepresentations, impaired his pursuit of civil remedies concerning his parental rights and deprived him of the ability to care for and protect the Minor Children. This claim does not assert a separate backward-looking constitutional denial-of-access-to-courts claim. The asserted deprivation is of Adam's parental liberty, not a freestanding entitlement to particular investigative procedures, unrestricted access to confidential records, a favorable custody determination, or prosecution of another person.

242. Substantive Due Process: Independent of the procedural due process theory, Adam alleges that the deliberate manipulation of evidence and interference described above deprived him of his fundamental parental liberty and family integrity by preventing him from caring for and protecting the Minor Children (which includes doing so through government processes for responding to reports of child abuse). The asserted abuse of governmental power is the intentional fabrication, suppression, and manipulation of evidence for the private purpose of protecting Megan, coupled with the alleged interference with Adam's exercise of his parental rights. Plaintiff alleges that this intentional misuse of governmental authority was arbitrary and sufficiently egregious to shock the conscience. This theory does not rest on negligence, disagreement with investigative judgments, or a general governmental duty to protect against private abuse.

243. County Liability: Watauga County is a person subject to suit under Section 1983. Plaintiff seeks to hold the County liable under the Monell Theory for the decisions and ratification of its alleged final policymaker described below, not merely because the County employed persons alleged to have committed wrongdoing.

244. Tom Hughes was, at all times relevant, a person and Director of Watauga County DSS.

245. Plaintiff alleges that Hughes possessed final policymaking authority on behalf of Watauga County over the DSS investigative practices and evidence-handling decisions at issue, including his direction and approval. The relevant statutory framework assigns the DSS director responsibility for administering social-services programs and assessing reports of child abuse and neglect, and permits delegation of authority to staff. N.C. Gen. Stat. § 108A-14(a)(3), (11), and (b). Plaintiff relies on Hughes' (in)actions and his exercise of the final authority alleged here,

not on Hughes's title alone or a contention that every statutory duty or discretionary investigative decision constitutes final County policy.

246. Director Hughes was, at all times relevant, acting under color of State law when he made the policies, practices, and decisions that effectuated denial of Adam's 14th Amendment liberty interests and due process.

247. Under the direct-decision theory, Plaintiff further alleges that Hughes exercised final authority by intentionally directing or approving the manipulation and dissemination of CPS evidence, including the report provided to the Sheriff's Office, the District Attorney's Office, and the court. The circumstances include Adam's report of investigative misconduct and offer of an audio recording, Hughes's refusal to listen to that recording and statement that it would not change anything, and continuation of the investigation without correction of the reported evidence-handling concerns. Plaintiff alleges that Hughes's direction or approval constituted the County decision that caused the deprivation of parental liberty. This theory rests on the alleged decision itself, not merely on refusal to investigate Adam's complaint or to pursue action against Megan.

248. Upon information and belief, Director Hughes also allowed Chief Duckworth to exert undue influence over the CPS investigative process.

249. Alternatively, to the extent County liability rests on ratification, Plaintiff alleges that Hughes approved both the challenged evidence-handling decisions and their improper basis. As described above, Hughes was informed of Adam's concerns, declined to review the offered recording, and did not correct the reported conduct despite the opportunity to address it. Those circumstances are alleged in support of the claimed approval; Plaintiff does not contend that a supervisor's failure to correct an employee's conduct, standing alone, establishes ratification.

The challenged County action is Hughes's alleged approval of the manipulation of evidence for the purpose described above.

250. The decisions and ratification alleged above are fairly attributable to Watauga County and were a moving force behind the alleged deprivation of Adam's constitutional rights. The County's liability is not premised on treating the Town of Boone, the Sheriff's Office, the District Attorney's Office, or the state district court as interchangeable with County DSS.

251. <u>Joint Action</u>: Upon information and belief, Megan and Duckworth agreed to use Duckworth's official position to influence Hughes and the CPS and Sheriff's Office investigations in Megan's favor through the evidence manipulation and interference alleged herein. Plaintiff bases the inference of joint action on the circumstances described above, including Megan's statement that "Duck" was involved, her alleged request for his assistance, the officer's report through Lyall of Duckworth's attempted interference with the CAC interview, and the ensuing change in the investigation, considered together with the alleged evidence manipulation and interference with representation. The representation allegations distinguish the first attorney's reported explanation from the information-and-belief allegation concerning the rumor's origin. The later attorney episodes provide context for the alleged interference; their withdrawals or inadequate performance, standing alone, are not alleged to establish acts by Duckworth. Plaintiff alleges the attempted interference with the CAC interview, influence over evidence handling, and interference with representation as acts in furtherance of the agreement. Duckworth is sued for his own alleged misuse of official authority. Megan is sued for her alleged willful participation in joint action with state actors, not merely for her relationship with Duckworth or participation in custody litigation. Plaintiff alleges that the joint conduct caused the deprivation of parental liberty described above.

252. Plaintiff alleges that the County action, together with the individual and joint conduct identified in paragraph 251, directly and proximately caused the deprivation of his parental liberty and the personal injuries described above. The County is sued for the alleged policymaker decisions attributable to it; Duckworth and Megan are sued for their respective participation in the conduct alleged against them. Plaintiff seeks damages attributable to that misconduct, not relief from a custody judgment or damages based solely on the proposition that the state court reached an incorrect custody decision.

253. There has not been a remedy for the deprivation of Adam's constitutional rights.

254. The actions of Watauga County were so egregious as to shock the conscience.

255. The alleged constitutional violations caused significant harm to Adam, including interference with his exercise of parental rights, aggravation of his CPTSD, and severe stress, anxiety, and depression requiring counseling and medication. Plaintiff seeks compensatory damages for his own injuries and nominal damages to the extent a constitutional violation is established without proof of compensable injury.

## **Claim # 2: Civil Obstruction of Justice**

**(Against All Defendants)**

256. Plaintiff incorporates the above paragraphs as if fully set forth herein.

257. Plaintiff alleges that Defendants intentionally interfered with his pursuit of civil remedies through their respective acts described below.

258. Upon information and belief, Duckworth misused his official position for the private purpose of protecting Megan through the alleged interference with evidence handling and Adam's legal representation identified below. This count challenges that conduct insofar as it intentionally obstructed Adam's pursuit of custody relief and enforcement, as well as his fair

participation in government processes in order to care for and protect his children, rather than asserting an independent right to a criminal investigation or prosecution.

259. Upon information and belief, Megan intentionally enlisted Duckworth because of his status as Police Chief to protect her from the consequences of her actions (i.e., CPS action; legal action; and losing custody of the Minor Children).

260. The alleged obstruction consists of multiple actions, including manipulation of the Minor Children's accounts and CPS records, creation of false Safety Plan and noncooperation records, dissemination of manipulated evidence, and interference with representation in Adam's pursuit of custody relief and enforcement. The County conduct is the evidence mishandling by its DSS personnel. Plaintiff invokes the County's responsibility under state law for its personnel's conduct in performing the DSS investigation, to the extent attributable to the County under applicable agency and scope-of-employment principles and within the insurance-related waiver of liability alleged above. This tort theory does not depend on establishing Monell liability. Duckworth's alleged conduct includes influence over evidence handling and, upon information and belief, origination or direction of the false rumor used to pressure Adam's first attorney to withdraw. Megan's alleged participation includes enlisting Duckworth and pressuring C.J. to recant. Plaintiff alleges that these respective acts intentionally impeded his ability to present evidence and obtain representation in pursuing the identified civil remedies.

261. The alleged purpose and effect of this misconduct were to hinder Adam's civil remedies concerning his parental rights. The criminal-investigation allegations provide context; this count does not seek recovery for the failure to investigate or prosecute Megan or treat that outcome as an independent injury. Liability is asserted for the alleged obstruction of the civil remedies identified above.

262. Adam alleges that the manipulation of evidence and interference with counsel hindered his pursuit of the civil remedies described above and caused the personal injuries alleged in this Complaint. He seeks recovery for injury caused by that alleged obstruction, without asking this Court to alter or invalidate a custody order.

263. Defendants' respective acts of obstruction directly and proximately caused Adam's personal injuries described above.

**Claim # 3: Intentional or Reckless Infliction of Severe Emotional Distress**

**(Against All Defendants)**

264. Plaintiff incorporates the above paragraphs as if fully set forth herein.

265. Plaintiff alleges extreme and outrageous conduct in the deliberate manipulation of evidence and interference with his parental rights and pursuit of legal remedies. As to the County, the challenged conduct includes DSS personnel's alleged manipulation of the children's accounts and records, including the false accusation that Adam violated a Safety Plan that Davis had told him did not apply to him. County responsibility is asserted under state-law agency and scope-of-employment principles for personnel's conduct in performing the DSS investigation, subject to paragraph 11, rather than as a consequence of Monell liability. As to Duckworth, the challenged conduct includes his alleged misuse of official influence to protect Megan through evidence manipulation and interference with representation; the later attorney episodes, standing alone, are not treated as established acts by him. As to Megan, it includes her alleged enlistment of Duckworth, pressure on C.J. to recant, participation in the joint conduct, and use of the October 21 hearing to seek abandonment of the proposed claims in exchange for limited supervised visitation. Plaintiff alleges that the respective conduct, considered in context, far exceeded ordinary conflict over custody. This claim does not rest merely on discourtesy, a

disputed professional assessment, or closure of an investigation.

266. Defendants' conduct was intended to cause, or was recklessly indifferent to the likelihood that it would cause, severe emotional distress to Adam. Duckworth's alleged intentional use of official influence to manipulate evidence and interfere with representation for the private purpose of protecting Megan is alleged as a corrupt misuse of authority, not a good-faith exercise of official discretion.

267. Adam experienced severe distress from the alleged interference with his parental rights and ability to pursue remedies concerning the reported abuse of the Minor Children.

268. Defendants' misconduct caused severe emotional distress to Adam. Specifically, it exacerbated the CPTSD caused by Megan during their marriage and caused severe and chronic stress, anxiety, and depression requiring regular counseling by a licensed professional counselor and prescription medication. Plaintiff seeks recovery for the aggravation and distress caused by the misconduct alleged in this action, rather than treating all preexisting symptoms as newly caused by these events.

269. The Minor Children reported that Megan harmed them after the CPS investigation was closed.

270. Defendants' respective acts directly and proximately caused the aggravation of Adam's pre-existing condition and severe emotional distress described above.

**Claim # 4: Abuse of Process**

**(Against Megan Joseph Teeters)**

271. Plaintiff incorporates the above paragraphs as if fully set forth herein.

272. "Process" was invoked by Megan against Adam in Watauga County District Court in a motion to modify custody of the Minor Children in the action Megan Joseph v. Adam

Joseph (22 CVD 000585-940) that was filed on July 10, 2026.

273. There was a hearing on Megan's above-referenced motion on October 21, 2026.

274. Modification of custody under N.C. Gen. Stat. § 50-13.7 requires a substantial change in circumstances affecting the child's welfare and a determination that modification serves the child's best interests.

275. On September 1, 2026, Adam's attorney sent a notice of intent to sue to Megan's attorney, Andy Brooks, with a list of allegations from this Complaint to instruct him and Megan to preserve all evidence potentially relevant to the matter.

276. This action seeks monetary relief for the alleged misconduct, whereas the custody motion sought modification of custody. Although the matters share factual issues, Plaintiff's abuse-of-process claim concerns the alleged use of the custody proceeding to obtain a collateral advantage concerning the proposed claims against Megan and Duckworth.

277. Megan had ulterior purposes in the hearing.

278. After filing the custody motion and after the September 1, 2026 notice of intent to sue, Megan, through her attorney, intentionally misused the October 21 hearing to gain an unfair advantage over Adam in this matter and retaliate against him for his stated intent to file this Complaint.

279. Specifically, Megan, through her attorney, used nearly the entire October 21 hearing for the purposes described in paragraph 235 above. Plaintiff identifies that alleged use of the pending custody process to obtain abandonment of separate claims as the willful act directed to a collateral objective. The objective was not simply to obtain a custody determination under N.C. Gen. Stat. § 50-13.7, but to use the proceeding to secure an advantage concerning the separate claims described in the September 1 notice.

280. Most of Mr. Brooks' questions were irrelevant to a modification of custody and overly prejudicial to Adam.

281. The hearing was only minimally tied to the legal standards in N.C. Gen. Stat. § 50-13.7 and was used for Megan's alleged ulterior objectives. This claim rests on the alleged collateral use of process described above, not merely on irrelevant questions, an adverse ruling, or a bad motive unaccompanied by misuse of process. Plaintiff does not ask this Court to weigh in on the outcome of the custody hearing or whether evidentiary rulings were correct.

282. Upon information and belief, Megan and her attorney also repeatedly sought to identify Adam's law enforcement contacts, including the officer who still works for Chief Duckworth at Boone Police.

283. The alleged misuse occurred after the custody process had been invoked; Plaintiff does not premise this claim solely on an improper motive for filing the July 10 motion.

284. Megan's alleged misuse of process directly and proximately caused Adam's personal injuries described above. Recovery under this count is sought for injury attributable to that misuse, not merely for the existence of the custody litigation or an adverse custody ruling.

**<u>Claim # 5: Negligence and Gross Negligence, Including Negligent Infliction of Emotional Distress in the Alternative</u>**

**(Against Watauga County)**

285. Plaintiff incorporates the above paragraphs as if fully set forth herein.

286. Plaintiff alleges that the County, through its DSS personnel, owed him a duty to exercise reasonable care in the direct dealings concerning the Safety Plan. The asserted duty encompasses accurate communication of the Safety Plan's applicability to Adam, reasonable performance of the undertaking to correct the record after Davis stated that the Plan did not apply

to him, and reasonable care in creating and handling records. This duty is alleged to arise from those dealings and that undertaking concerning Adam's own conduct, not merely from a general obligation to protect the public or the Minor Children. County responsibility is asserted under state-law agency and scope-of-employment principles for DSS personnel's performance of those dealings during the investigation.

287. The individual nature of the asserted duty is grounded in the interactions described above: DSS instructed Adam to seek emergency custody; he participated as a parent and witness; DSS served him with a Safety Plan; Davis stated that service on him was accidental and that the Plan was intended only for Megan; Adam requested correction; Davis agreed to correct the record; and Davis later accused him of violating that same Plan. Plaintiff currently seeks recovery for his own injuries arising from the alleged breach of duties in those dealings, not for damages belonging to the Minor Children.

288. DSS personnel allegedly breached those duties by failing to correct the Safety Plan record after stating that it did not apply to Adam and by creating or maintaining inaccurate records about his compliance and cooperation. The ordinary-negligence alternative is that these acts or omissions resulted from a failure to exercise reasonable care in correcting or maintaining the records, rather than deliberate falsification. This theory concerns careless performance of the direct dealings and undertaking identified above. It does not require proof of an agreement to manipulate evidence or of conscious disregard, and does not rest on a duty to investigate or prosecute Megan in a particular manner.

289. It was reasonably foreseeable that the alleged breaches would cause Adam severe emotional distress in light of his direct participation in the investigation and his relationship to the Minor Children. The conduct in fact caused the aggravation of CPTSD and the

severe stress, anxiety, and depression requiring counseling and medication described above. Plaintiff pleads negligent infliction of emotional distress in the alternative on that basis.

290. The gross-negligence theory is that the failure to correct the Safety Plan record after notice, followed by the accusation of a violation, reflected conscious or reckless disregard of the duties owed to Adam rather than mere carelessness. Plaintiff relies on Davis's acknowledgment that the Plan did not apply to him, her promise to correct the record, and the later accusation described above as circumstances supporting that inference. The asserted willful and wanton disregard concerns the handling of the record after notice, not merely the degree of resulting harm; deliberate falsification remains the separate intentional-misconduct theory.

291. The alleged breaches directly and proximately caused Adam's personal injuries, including the severe emotional distress described above. The County tort claims are subject to the waiver of governmental immunity and are asserted only to the extent permitted by applicable coverage.

**Claim # 6: Violation of the North Carolina State Constitution**

**(Against Watauga County)**

292. Plaintiff incorporates the above paragraphs as if fully set forth herein.

293. This direct state constitutional claim is pleaded in the alternative to the County tort claims. If governmental immunity or another legal barrier forecloses those remedies for the constitutional injury alleged here, Plaintiff seeks Corum relief directly under the North Carolina Constitution only to the extent no adequate state-law remedy remains. Plaintiff contends that the availability of custody review or enforcement does not, by itself, furnish a remedy against the County for the personal injury allegedly caused by its unconstitutional evidence manipulation; adequacy must be assessed by the relief those procedures afford for that injury, not merely by

their availability to alter or enforce a custody order. Plaintiff seeks redress for the County's alleged constitutional misconduct, not review of the custody ruling. An unfavorable result on the merits, the absence of Plaintiff's preferred form of damages, or immunity from a tort claim does not establish the constitutional violation asserted in this count.

294. The Law of the Land Clause of Article I, Section 19 of the North Carolina Constitution protects parental liberty and prohibits unlawful governmental deprivation of that liberty. Watauga County is sued as a local governmental entity exercising governmental authority through DSS. Plaintiff invokes the protections of the North Carolina Constitution independently of his federal claim.

295. Specifically, Plaintiff alleges that the County, acting through DSS, deprived him of parental liberty and due process under Article I, Section 19 by the intentional manipulation and dissemination of evidence described above. The challenged conduct includes the manipulation of the Minor Children's accounts; the false Safety Plan violation and non-cooperation records; and Hughes's alleged direction or approval of the conduct. Plaintiff alleges that this conduct interfered with his exercise of parental rights and ability to pursue remedies concerning those rights, causing his own injuries. This count invokes the independent protections of the North Carolina Constitution and does not depend solely on establishing the federal claim.

296. This claim concerns the resulting interference with Adam's parental liberty, not an asserted state constitutional guarantee of a particular investigative outcome or prosecution.

297. The County's alleged unconstitutional conduct directly and proximately caused Adam's personal injuries described above. Plaintiff seeks a remedy for the proven constitutional injury only to the extent no adequate state-law remedy exists, without duplicative recovery for the same injury under another count.

## V. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests judgment against the respective Defendants on the above claims and requests the following relief:

1. Judgment establishing each Defendant's liability for the respective claims proved against that Defendant;

2. Compensatory damages for Plaintiff's injuries proximately caused by Defendants' actionable conduct;

3. An award of post-judgment interest as permitted by law;

4. Punitive damages against Megan Joseph Teeters and Daniel Duckworth in their individual capacities, to the extent authorized under the law governing each claim, based on their alleged egregious, willful, and wanton conduct in disregard of Adam's rights, to punish and deter such conduct. No punitive damages are sought against Watauga County;

5. Nominal damages to the extent authorized for a proven constitutional violation without proof of compensable injury;

6. Taxable costs and reasonable attorney's fees under 42 U.S.C. § 1988 to the extent Plaintiff qualifies for such an award, and any other fees or costs authorized by applicable law; and

7. Such other relief as is permitted by law and consistent with this Complaint.

## VI. JURY DEMAND AND LIMITED INSURANCE-ISSUES WAIVER

To the extent required by N.C. Gen. Stat. § 153A-435(b), Plaintiff waives jury determination of issues of law or fact relating to insurance. Plaintiff demands a jury trial on all other issues so triable, including issues of liability and damages.

Respectfully submitted on November 5, 2026.

/s/ Ian McRary

Ian M. McRary
NC Bar No. 43057
McRary Law, PLLC
214 Main Avenue Dr., Suite 1
Taylorsville, NC 28681
Tel: (828) 235-5551
Email: ian@mcrarylaw.com

*Attorney for Plaintiff*